UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

C.A. No.: 3:17-CV-878-MPS

------------------------------

SYR'EYE JEFFERIES, PPA,

MELISSA SANTOS-JEFFERIES

            Plaintiff


    VS.


BCI BURKE COMPANY, LLC, and

DESIGN BUILT, LLC

            Defendants

------------------------------



    Deposition of MELISSA SANTOS-JEFFERIES, taken on behalf of the Defendant, through counsel, at the office of Cooper Sevillano, 1087 Broad Street, Bridgeport, Connecticut, February 28th, 2018, commencing at 10:35 a.m., before Nadine M. Castonguay, a Registered Professional Reporter, and Notary Public.



Page 2

 1

    APPEARANCES:

 2

 3

 4   FOR THE PLAINTIFF:

 5             COOPER SEVILLANO, LLC

 6             1087 Broad Street

 7             Bridgeport, Connecticut   06604

 8                 BY:   Jeffrey M. Cooper, Esq.

 9

10

11

12   FOR THE DEFENDANT, BCI BURKE:

13             MANION GAYNOR & MANNING, LLP

14             One Citizens Plaza, Suite 620

15             Providence, Rhode Island   02903

16                 BY:   Kevin W. Hadfield, Esq.

17

18   FOR THE DEFENDANT, DESIGN BUILT, LLC:

19             MORRISON MAHONEY, LLP

20             One Constitution Plaza, 10th Floor

21             Hartford, Connecticut   06103-1810

22                 BY:   Joseph R. Ciollo, Esq.

23

24

25



1                    STIPULATIONS

2

3              IT IS HEREBY STIPULATED AND

4         AGREED by and among Counsel for

5         the respective parties that all

6         formalities in connection with

7         the taking of the deposition,

8         including time, place,

9         sufficiency of notice, and the

10        authority of the officer before

11        whom it is being taken, are

12        hereby waived.

13

14             IT IS FURTHER STIPULATED AND

15        AGREED by and among Counsel for

16        the respective parties that all

17        objections, except as to form,

18        are reserved until time of

19        trial.

20

21             IT IS FURTHER STIPULATED AND

22        AGREED by and among Counsel for

23        the respective parties that the

24        reading and signing of the

25        deposition is waived.



Page 4

```
 1                    MELISSA SANTOS-JEFFRIES, called
 2    as a witness, being first duly sworn/affirmed
 3    by Nadine M. Castonguay, RPR, LSR, a Notary
 4    Public duly commissioned and qualified,
 5    was examined and testified as follows:
 6
 7              THE COURT REPORTER:  Usual
 8       stipulations?
 9              MR. HADFIELD:  Yes.
10              MR. CIOLLO:  Yes.
11              MR. COOPER:  Yes.  We will waive
12       reading and signing.
13    EXAMINATION
14    BY MR. HADFIELD:
15       Q.    Good morning, Ms. Santos-Jefferies.
16    May I call you Ms. Santos-Jefferies?
17       A.    Yeah, that's fine.
18       Q.    My name is Kevin Hadfield.  I
19    represent a company called BCI Burke.  We've
20    noticed your deposition and you are here today
21    in connection with a lawsuit that's been filed
22    by you on behalf of Syr'Eye Jefferies.  You
23    understand that, correct?
24       A.    Yes.
25       Q.    What is your relationship with
```



Page 5

```
 1   Syr'Eye?
 2       A.    Mother.
 3       Q.    And I'll show you, for the record, a
 4   copy of the notice of deposition that we've
 5   marked as Exhibit 1.
 6               Have you ever had your
 7   deposition taken before?
 8       A.    I have had one before, yes.
 9       Q.    You've had a deposition before?
10       A.    Yes.
11       Q.    So we'll talk about that in a minute.
12   You probably have some familiarity with the
13   process, and I'm sure you spoke with your
14   attorney about it.  Just to remind you of some
15   ground rules.  You are under oath.
16               There is a court reporter
17   sitting here with us in the room who is taking
18   down everything that we say.  If you can do
19   your best to let me finish a question before
20   you start your answer, it will help out the
21   record and the court reporter to do her job.
22               If you need a break at any time,
23   at any time -- obviously, you have a little one
24   with you here today, so you don't have to ask
25   why or you don't need to give us a reason.
```



Page 6

1                    Just say you need a break.  We

2     will go off the record and you can take a

3     break.  I will just ask if there is a question

4     pending, please answer the question before we

5     go on break.  Is that okay?

6         A.   Yes.

7         Q.   You said you were deposed once

8     before.  When was that?

9         A.    I honestly don't remember the day.

10    It was a case with Attorney Cooper as well.

11        Q.   Was that a case in which you were a

12    plaintiff?

13        A.   Yes.

14        Q.   You sued somebody?

15        A.   Yes.

16        Q.   Do you remember what the subject

17    matter of that suit was?

18        A.   Slip and fall.

19        Q.   And it was your loss.  You were the

20    plaintiff?

21        A.   Yes.

22        Q.   Is that case still pending?

23        A.   No.

24        Q.   Did it end up in a verdict, a

25    settlement?



```
 1        A.    Settlement.

 2        Q.    Do you remember where that was filed,

 3   what court it was filed in?

 4        A.    I don't.

 5        Q.    Okay.  So Syr'Eye is your son?

 6        A.    Yes.

 7        Q.    And how old is Syr'Eye today?

 8        A.    Nine.

 9        Q.    What is his date of birth?

10        A.    ████/09.

11        Q.    Do you have any other children?

12        A.    Yes.

13        Q.    How many?

14        A.    Five.

15        Q.    And what are their names and ages?

16        A.    E██████ S██████████, 19, E██████

17   S█████-J██████████.

18        Q.    And how old?

19        A.    He's 15.  And X████████.  And he's 11,

20   and S██████.  And then A████ L██████████, and

21   he's two and then I have A████████.  And last

22   name -- she's almost a year, 11 months.

23        Q.    What was her last name?

24        A.    Y-████████████.

25        Q.    So six children total?
```



```
 1        A.    Yes.

 2        Q.    Are you married?

 3        A.    Yes.

 4        Q.    And what is your --

 5        A.    Chad Jefferies.

 6        Q.    Is this your only marriage?

 7        A.    Yes.

 8        Q.    And Chad is Syr'Eye's father?

 9        A.    Yes.

10        Q.    Okay.  And what is your current

11   address?

12        A.    ██████████████████████████████

13   ██████████████████

14        Q.    How long have you been there?

15        A.    About a month.

16        Q.    So I will just represent to you in

17   your interrogatory responses dated fairly

18   recently your address was ██████████████████

19   ██████████

20        A.    Yes.

21        Q.    Was that your last address?

22        A.    Yes, it was.

23        Q.    How long were you there for?

24        A.    One month.

25        Q.    And before that?
```



```
 1        A.    ███████████████  and that's  ██████
 2     ████████████████████████.
 3        Q.    How long were you there for?
 4        A.    I believe 18 months.
 5        Q.    Was that where you were living at the
 6     time of the incident that brings us here today?
 7        A.    No.
 8        Q.    Where were you living at that time?
 9        A.    I'm trying to think of the address.
10        Q.    Do you remember the town?
11        A.    It was in New Haven.
12        Q.    Was it an apartment or a house?
13        A.    Yes.  It was an apartment.
14        Q.    And did Syr'Eye live with you at that
15     time?
16        A.    Yes.
17        Q.    In the apartment in New Haven.
18        A.    Yes.
19        Q.    Who else lived with you at that time?
20        A.    My children and my husband.
21        Q.    So that would have been?
22        A.    All with the exception of E██████.
23     She was not.
24        Q.    Are you employed?
25        A.    No.
```



1        Q.    When was the last time you were

2    employed?

3        A.    Last year, 2017.

4        Q.    What did you do?

5        A.    I was working at ███████

6    ███████████████████.

7        Q.    What did you do for them?

8        A.    I was the coordinator there.

9        Q.    Coordinator of what?

10       A.    I don't know how you want me to

11   elaborate.

12       Q.    Just tell me what your job duties

13   were if you could.

14       A.    So we were in the -- Oh, my gosh.  I

15   can't think of the department.  Oh, my gosh.

16   So what we did basically is we provided

17   services to the ████████ -- I apologize.  I

18   can't think of the department.

19                   We provided services to ████████

20   employees concierge department.  So we provided

21   services to the employees there.  We did errand

22   running; we did planning any kind of service

23   they needed; if they needed us to book tickets,

24   we would do that.

25                   If they needed services helping



Page 11

```
 1   with the birthday party that they were having,

 2   they would have us assist in that.  So it was

 3   very -- it wasn't just one thing.  It was

 4   different things that the employees needed.

 5   Basically we were there to service them and

 6   help their lives a little bit easier.

 7        Q.   How long did you have that job for?

 8        A.   I started December 2015.

 9        Q.   So a little under two years?

10        A.   Yes.

11        Q.   Where did you live?

12        A.   I initially left to have her, and

13   then because they down sized, the position was

14   taken away.

15        Q.   Are you currently looking for work?

16        A.   No.

17        Q.   Is your husband working?

18        A.   Yes, he does.

19        Q.   What does Mr. Jefferies do?

20        A.   He works in auto and he's an

21   auctioneer.

22        Q.   Is there any other household income

23   other than Mr. Jefferies' income?

24        A.   No.

25        Q.   There's no state assistance or
```



1    disability payments or anything like that?

2        A.    No.

3        Q.    Just give me a -- well, before 2015,

4    what was the last job before 2015?

5        A.    I was at home for a while, so...  I

6    was a stay at home mom for a few years.

7        Q.    Mm-hmm.

8        A.    So I wasn't working before that.

9        Q.    Okay.  Just give me a snapshot of

10   your educational history.

11       A.    I graduated 1996 from high school.

12   Attended Southern Connecticut State University

13   for two years, till 1998.  And in 2010 I

14   graduated with a paralegal certification.

15       Q.    Where did you graduate from

16   high school?

17       A.    Hamden High School.

18       Q.    Any other schooling other than

19   Southern Connecticut State University and

20   high school?

21       A.    No.

22             MR. HADFIELD:  Off the record.

23             (Off the record.)

24             MR. HADFIELD:  Back on.

25   BY MR. HADFIELD:



```
 1        Q.    So going back, you mentioned that you
 2    had a slip-and-fall case with Attorney Cooper?
 3        A.    Yes.
 4        Q.    Do you remember if was that before or
 5    after the incident with Syr'Eye?
 6        A.    It was before.
 7        Q.    Okay.  All right.  So as I understand
 8    it, reading the complaints and the discovery
 9    responses, we're here because of an incident
10    that happened with Syr'Eye Josh's Jungle in
11    Hamden?
12        A.    Correct.
13        Q.    And what is Josh's Jungle?
14        A.    A playground for both handicapped as
15    well as children without a handicap.
16        Q.    Had you been there the date of the
17    incident?
18        A.    No.
19        Q.    That was your first time there?
20        A.    Yes.
21        Q.    Was it Syr'Eye's first time there?
22        A.    Yes.
23        Q.    And I have the date of the incident
24    as April 11, 2014.  Does that sound right?
25        A.    I believe so, yes.
```



Page 14

```
 1        Q.   And certainly if somewhere in the
 2   records, you rely -- you defer to the records,
 3   right?
 4        A.   Yes.
 5        Q.   What was the weather like that day?
 6        A.   Beautiful.  Very warm, sunny.  It was
 7   the first warm day of the season, so it was
 8   very nice.
 9        Q.   Any rain or any other kind of weather
10   in the recent past that you can remember?
11        A.   No.
12        Q.   And who went to Josh's Jungle that
13   day with you?
14        A.   Myself, Syr'Eye, X███████and E█████.
15        Q.   And how old were X██████ and E██████
16   at that time?
17        A.   Four years ago, so E██████ was
18   probably 12 and X██████ was probably eight,
19   maybe about eight, yes.
20        Q.   Okay.  And what time of day did you
21   go to Josh's Jungle?
22        A.   It was in the afternoon.
23        Q.   Are you able to give me any kind of
24   closer time frame, 1:00, 2:00, 3:00?
25        A.   Honestly, I don't remember.
```



Page 15

```
 1        Q.    What had you done up until that point

 2   in the day?  Do you recall?

 3        A.    We were just home.  We hadn't been

 4   out beforehand, so that was our first time out.

 5        Q.    How did you get to Josh's Jungle?

 6        A.    I drove my car.

 7        Q.    And at the time you lived in

 8   New Haven?

 9        A.    Yes.

10        Q.    Was there a reason you went to

11   Josh's Jungle in particular?

12        A.    I saw the playground.  I knew about

13   the playground, living in Hamden.  And then I

14   saw the playground when we went to the library

15   a few times, so...  The kids wanted to -- they

16   always wondered about the playground.  They

17   always asked if they could go.  So I thought

18   this would be a good day to bring them.

19        Q.    Was this a weekend?

20        A.    Honestly, I don't remember if it was

21   the weekend.

22        Q.    It was in April, so it would be

23   school time.

24        A.    So, then, yes.  It must have been a

25   weekend.
```



```
 1        Q.    Was the playground crowded when you
 2   got there?
 3        A.    Yes.
 4        Q.    And best you can, if you can
 5   ballpark for me how many people you think were
 6   there?
 7        A.    Maybe 25, 30.  Maybe about 25.
 8        Q.    How many children were there?
 9        A.    Oh, honestly, I don't remember.
10        Q.    Was this a fair mix of children and
11   adults?
12        A.    Yes.
13        Q.    Obviously you had children between
14   the ages of five and 12 there.  Were the other
15   children that were there, would they range from
16   infants to adolescence.  Was it a mix of --
17        A.    It was a mix, yes.
18        Q.    As I understand it, Syr'Eye's
19   accident involved a piece of playground
20   equipment at Josh's Jungle?
21        A.    Yes.
22        Q.    Are you able to describe for me that
23   piece of equipment?
24        A.    Yes.  It was rather large.  It was
25   able to hold a wheelchair.  It was for
```



Page 17

1  handicapped.  This was one of the rides that

2  were able to hold handicapped children.  So a

3  child that was in a wheelchair was able to fit

4  in it.  So they would sit in the middle

5  section.

6                    There was the area for you to

7  sit or for the wheelchair to be in and it

8  tilted.  You can kind of push it but not like a

9  swing.  You push it.  It would, like, tilt back

10  and forth.  So it was kind of a swing, but it

11  didn't swing so freely like a swing.  It was a

12  metal apparatus.

13       Q.   It rocked?

14       A.   It rocked.  It more rocked.  And so

15  kids could rock it and it would go side to

16  side.

17            MR. HADFIELD:  Can you mark this as

18       Exhibit 2.

19            (So marked, Exhibit No. 2.)

20  BY MR. HADFIELD:

21       Q.   Before I go further, do you remember

22  if there was any surveillance cameras at the

23  playground?

24       A.   I don't remember.

25       Q.   Were there any attendants at the --



Page 18

```
 1        A.   No.
 2        Q.   I'm trying to think of the equivalent
 3   of a lifeguard?
 4        A.   No.
 5        Q.   Nobody from the town there observing,
 6   anything like that?
 7        A.   No.
 8        Q.   And this playground was open to the
 9   public?
10        A.   Yes.
11        Q.   So I will show you what's been marked
12   as Exhibit 2.  Do you recognize that?
13        A.   Yes.
14        Q.   What is it?
15        A.   That's what -- that's the apparatus
16   that Syr'Eye was hurt on.
17        Q.   So this is the piece of playground
18   equipment that Syr'Eye injured himself on?
19        A.   Yes.
20        Q.   Is this picture on page one of
21   Exhibit 2, is that a fair and accurate
22   depiction of the way that the piece of
23   equipment looked on the date of the incident?
24        A.   Yes.
25        Q.   And if you just flip to page 2. Looks
```



Page 19

1    like there's a -- is that also a photograph of

2    the piece of equipment?

3         A.   Yes.

4         Q.   And there are some people in there to

5    [] give you us some context for size?

6         A.   Yes.

7         Q.   Ms. Santos-Jefferies, the piece of

8    equipment that is depicted in Exhibit 2, is

9    this the first time that you saw a piece of

10   equipment of this type that was at the day of

11   the incident?

12        A.   Yes.

13        Q.   So you never came across anything

14   like this before then?

15        A.   No.

16        Q.   How long had you been at the

17   playground that day before the accident

18   happened?

19        A.   Probably about 45 minutes.

20        Q.   And when you arrived there, was it

21   just -- did you let the kids go and kind of

22   watch them play, or what happened when you got

23   there?

24        A.   As soon as we got there, they began

25   to play, yes.


MAGNA
LEGAL SERVICES

Page 20

1          Q.    And there's certainly more apparatus

2     equipment than what is exhibited in this

3     picture, correct?

4          A.    Yes.

5          Q.    Was there a particular spot at the

6     playground that you were situated in for this

7     45 minutes or were you walking around?

8          A.    I was sitting on the bench that was

9     closer to the entrance of the playground.

10          Q.    Okay.  Could you see the piece of

11     equipment?  Well, let's just -- so we're all

12     talking about the same thing, I will call what

13     is shown in Exhibit 2 as the cruiser.

14          A.    Okay.

15          Q.    I will represent to you that's what

16     is depicted in Exhibit 2.

17                Where was the bench in

18     comparison with the cruiser?

19          A.    When you go into the entrance, the

20     bench was to the left, and if you go to the

21     left and then kind of take a slight right, I

22     believe there was something first.  And then

23     the cruiser was slightly after that.

24          Q.    So was there something between the

25     bench and the cruiser?



Page 21

```
 1        A.    Yes.

 2        Q.    Was there another piece of equipment?

 3        A.    Yes.

 4        Q.    From the bench, could you see the

 5  cruiser, if you recall?

 6        A.    I don't recall.  I believe I could

 7  see it slightly, like a piece of it sticking

 8  up, but I couldn't see the whole cruiser.

 9        Q.    For any time of that 45 minutes

10  before the incident happened, did you observe

11  anyone playing on the cruiser?

12        A.    I don't recall seeing anyone playing

13  on it.

14        Q.    So you didn't -- you weren't able to

15  see how it operated?

16        A.    No.

17        Q.    You didn't watch other people operate

18  this piece of equipment?

19        A.    No.

20        Q.    How did you learn about it?

21        A.    How did I learn about?

22        Q.    What happened to Syr'Eye.

23        A.    Well, my son E_____  and X_____  came

24  running to me and told me he had been injured.

25        Q.    What did they tell you?
```



Page 22

```
 1        A.    They told me, if I recall, that he
 2   was just hurt.   They came running.   They were
 3   frantic.   So I immediately got up and went to
 4   see what was going on.
 5        Q.    So if I understood you correctly,
 6   they told you he was hurt?
 7        A.    Yes.
 8        Q.    And then what did you do?
 9        A.    I ran over to where Syr'Eye was.   He
10   was actually sitting on a bench next to a
11   gentleman who did observe it.   He was sitting
12   on the bench that was directly across from the
13   cruiser.   And that's when he informed me he
14   believed that Syr'Eye had broken his leg, and
15   he thought that I needed to take him to the ER.
16        Q.    You say "he," would that be the
17   gentleman that --
18        A.    Yes, the witness.
19        Q.    Sorry.
20        A.    That's okay.
21        Q.    Do you happen to know the gentleman's
22   name?
23        A.    No.
24        Q.    Did you happen to know the names of
25   anyone other than your two children, X
```



Page 23

1    and E█████, who saw the incident?

2         A.   No.

3         Q.   Was this gentleman that was on the

4    bench with Syr'Eye, was he an adult?

5         A.   Yes.

6         Q.   And were there other adults in the

7    vicinity of the cruiser?

8         A.   Yes.

9         Q.   So when X██████ and E██████ told you

10   about Syr'Eye being hurt and you went over to

11   the cruiser, can you tell me how many people

12   were on the cruiser at the time?

13        A.   No.

14        Q.   Was it more than one?

15        A.   I don't know.

16        Q.   Are you able to tell me how many

17   people were in the immediate vicinity of the

18   cruiser?

19        A.   No.

20        Q.   Did it look like there were

21   multiple -- withdrawn.

22             Did it look like there had been

23   multiple people playing on the cruiser at the

24   time of the incident or immediately after?

25        A.   At the time -- I apologize.  I might



Page 24

```
 1    have misunderstood.  I thought -- am I correct

 2    with thinking when you were asking me how many

 3    people were there, do you mean at the time that

 4    this happened to Syr'Eye or when I went to

 5    check on him?

 6         Q.    Sure.  So, please, if you don't

 7    understand a question, let me know and I will

 8    fix it.

 9         A.    Okay.

10         Q.    And that's a good point.

11               So I understand that you didn't

12    actually see the incident?

13         A.    Yes.

14         Q.    So if I asked you how many people

15    were on the cruiser at the time of the

16    incident, you wouldn't be able to tell me?

17         A.    Right.

18         Q.    So what I'm interested in is when you

19    went to the cruiser after you were told about

20    the incident, was there anything in the

21    cruiser?

22         A.    I don't know.

23         Q.    You don't recall one way or the

24    other?

25         A.    No.
```



Page 25

```
1          Q.    Are you able to recall how many
2     people may have been around the vicinity of the
3     cruiser?
4          A.    No.
5          Q.    Obviously there was a man on a bench?
6          A.    Yes.
7          Q.    Were there other people around?
8          A.    Yes.
9          Q.    You couldn't tell me how many?
10         A.    Yes.
11         Q.    Were there other adults around?
12         A.    Yes.
13         Q.    Other adults other than the gentleman
14    on the bench?
15         A.    Yes.
16         Q.    Other than this gentleman, did you
17    speak with anyone else that was there?
18         A.    No.
19         Q.    So Syr'Eye is sitting next to a
20    gentleman on the bench.  The gentleman told you
21    that he believes the leg is broken?
22         A.    Yes.
23         Q.    And then what happened?
24         A.    Then I scooped Syr'Eye up, put him in
25    my car, and we drove to the emergency room.
```



1      Q.   Did X█████ and E█████ come with you

2  to the emergency room?

3      A.   Yes.

4      Q.   So it was the four of you in the car

5  that drove to the emergency room?

6      A.   Yes.

7      Q.   Which emergency room did you go to?

8      A.   Yale.

9      Q.   There was some references in the

10  medical records that suggest you may have gone

11  to St. Raphael's emergency room first?

12      A.   Oh, I apologize.  See, that's part of

13  Yale.  So, yes, we went to St. Raphael's.  Then

14  we went to Yale.  He was actually transferred

15  in the ambulance to the main campus.  So, yes,

16  it is St. Raphael's, or formerly St. Raphael's.

17      Q.   There was no time delay here.  The

18  incident happened -- you picked up Syr'Eye and

19  you went directly to the emergency room?

20      A.   Yes.

21      Q.   I don't think I have seen the

22  records.  I don't know if they would be under a

23  separate --

24           MR. COOPER:  I think at the time it

25       would have been Yale/St. Ray's campus is



Page 27

1          how they define it?

2          A.   Yes.

3               MR. COOPER:  If we didn't supply

4          those, then, I can certainly try to see if

5          there is anything in existence.  Do you

6          think that there is something missing?  Is

7          there an admission?

8               MR. HADFIELD:  I didn't see an

9          initial point of contact admission form.

10         So if you can have someone from your

11         office follow up.

12              MR. COOPER:  Yes.  I will make a note

13         now.

14              MR. HADFIELD:  I suspect there may be

15         that ER intake note and a couple of

16         transfer notes.

17              MR. COOPER:  I will try to get my

18         hands on them and produce them for you.

19              MR. HADFIELD:  Thanks.

20    BY MR. HADFIELD:

21         Q.   So to back up, you went to

22    St. Raphael's ER and you were transferred to

23    Yale?

24         A.   Yes.

25         Q.   And by "you" I mean Syr'Eye.



Page 28

1          A.    Yes.

2          Q.    So what were you told at

3    St. Raphael's?

4          A.    That they believed it was broken.

5          Q.    Did they take X-rays at the emergency

6    room?

7          A.    Yes, they did.

8          Q.    And walk me through what happens once

9    Syr'Eye gets transferred to Yale?

10         A.    I honestly don't remember exactly

11   what happened.  They took him in an ambulance.

12   I didn't ride with him, but he ended up needing

13   surgery.  So I was there throughout that whole

14   time.  I didn't leave him.  He had the surgery.

15   I stayed there in the surgery, and then I

16   stayed with him during the recovery afterwards.

17         Q.    And how long was he in the hospital

18   facility for?

19         A.    Just a day.  He had his surgery later

20   on that evening, or it might have been the

21   morning hours.  I don't remember the time, but

22   it was a few hours after the initial incident.

23                    So it was later, definitely

24   later that evening that he had the surgery.

25   And then after the surgery and after recovery



Page 29

1       he was discharged home.

2             Q.    This all happens over the span of 24

3       hours, 48 hours?

4             A.    Twenty-four hours, I believe it was.

5             Q.    So he comes in.  He gets x-rayed at

6       St. Raphael's?

7             A.    Yes.

8             Q.    He's transferred to Yale?

9             A.    Yes.

10            Q.    Diagnosed, has the surgery?

11            A.    Yes.

12            Q.    And then he is released shortly

13      thereafter?

14            A.    Yes.

15            Q.    Okay.  During the time period in the

16      hospital, this 24-hour period, how is Syr'Eye

17      doing outwardly?  How is he handling it?

18            A.    He did pretty well.  I thought he was

19      a little -- I thought that he would not handle

20      it as well as he did.  But he did, you know.

21      He was a trooper.  He did pretty good.

22            Q.    When you saw him on the bench

23      immediately after the incident, how was he

24      doing then?

25            A.    He was in a panic.  He was crying.



Page 30

```
 1        Q.    So after he was discharged, was he
 2   sent home with you?
 3        A.    He was sent home with me, yes.
 4        Q.    And walk me through the week, the two
 5   weeks following his discharge.  Was he
 6   bedridden?  Was he in a cast, not moving?
 7   Describe for me in your own words, please.
 8        A.    He was in a body cast.  They provided
 9   a wheelchair; I had to take him -- because he
10   was in a body cast, I had to take him to the
11   bathroom, help him with that.  So he was pretty
12   much bedridden because the type of cast he had
13   was not a full body.  It was a half-body cast,
14   so he couldn't move.  So he was very limited on
15   things he could do.
16        Q.    If I understood you correctly, he's
17   in a cast that is up his entire left leg and
18   comes around a portion of his pelvis?
19        A.    It came up past his belly button, so
20   almost to his chest.
21        Q.    How long did he have to get around in
22   a wheelchair for?
23        A.    Maybe six, eight weeks.  At least
24   six, if I'm correct.
25        Q.    After how much time was he able to
```



Page 31

1  walk?

2      A.    You mean after he was out of the cast

3  and everything was --

4      Q.    Was he able to walk in the cast?

5      A.    No.

6      Q.    So it wasn't until the cast came off

7  he was able to walk?

8      A.    No.

9      Q.    Any idea what period of time that

10  was?

11      A.    I think about six weeks, might have

12  been eight.

13      Q.    So after the six- to eight-week

14  period in the cast, was he able to walk as soon

15  as the cast came off?

16      A.    No.

17      Q.    So after the cast comes off, how was

18  he getting around?

19      A.    With my assistance and my husband's

20  assistance.

21      Q.    And by that, what do you mean?

22      A.    Because he was in a cast so long, it

23  took him a while to get the hang of walking, so

24  he had crutches the doctor gave us.  So we

25  tried to help him use those, and we just tried



Page 32

```
 1    to help him as best we could until he was able
 2    to use that leg again.
 3         Q.   And how long after the cast comes off
 4    was he able to fully use that leg again, to
 5    walk on his own?  That's a bad question.
 6              How long after the cast came off
 7    was he able to walk on his own?
 8         A.   I would say maybe two weeks.
 9              THE WITNESS:  Do you mind if I step
10         out?
11              (Off the record.)
12              MR. HADFIELD:  Back on.
13    BY MR. HADFIELD:
14         Q.   Just picking back up, you mentioned
15    he was able to walk on his own about two weeks
16    after the cast came off, so that would be about
17    eight to ten weeks after the incident itself?
18         A.   Yes.
19         Q.   Once he can walk on his own, was
20    there any limitation to what he can do for a
21    period of time?
22         A.   He couldn't run.  He couldn't play
23    sports.
24         Q.   And did there come a time when he was
25    able to do those things again?
```



Page 33

```
 1        A.    Yes.
 2        Q.    So after he was able to walk, so that
 3   eight- to ten-week period after this, how much
 4   longer after that was he able to run and play
 5   sports, be fully involved?
 6        A.    Fully, I would say a few months.  It
 7   was at least a few months.  I honestly couldn't
 8   give you an exact time, but it took a while for
 9   him to be fully able to do everything.
10        Q.    Was it less than a year?
11        A.    I would say less than a year.
12        Q.    Less than six months?
13        A.    I would say at least six months to be
14   fully able to.
15        Q.    So six months after the incident
16   would take us to October 2014.  Was it some
17   time in the fall that he was fully functional
18   again?
19        A.    I would think, yes.
20        Q.    So during this time, after the
21   incident up until the point when he's fully
22   functional, we will say sometime perhaps in the
23   fall of 2014, did Syr'Eye experience any pain
24   during that period?
25        A.    Not that I'm aware of.
```



Page 34

```
 1        Q.    He handled it fairly well?

 2        A.    Yes.

 3        Q.    And today and obviously we're almost

 4   four years after the incident, does Syr'Eye

 5   play any sports?

 6        A.    He does.

 7        Q.    What sports does he play?

 8        A.    Basketball.

 9        Q.    Any limitations with the basketball

10   court?

11        A.    No.

12        Q.    Is he able to run completely?

13        A.    Yes.

14        Q.    Is he limited in any way as a result

15   of the bone break that he had back four years

16   ago?

17        A.    No.

18        Q.    Has he had any other accidents or

19   incidents since the one involving the cruiser?

20        A.    No.

21        Q.    Nothing involving that leg?

22        A.    No.

23        Q.    Did he have any accident or incident

24   involving that leg prior to the incident

25   involving the cruiser?
```



Page 35

```
 1       A.   No.

 2       Q.   When was the last time he saw a

 3  doctor for his leg?

 4       A.   That same year with a follow-up.

 5       Q.   In 2014?

 6       A.   Yes.

 7       Q.   The last record I have I will

 8  represent to you is that he went in for

 9  follow-up in about October of 2014?

10       A.   Yes.

11       Q.   Is that the last time he saw a

12  doctor?

13       A.   Yes.

14       Q.   And he's not undergoing any ongoing

15  or periodic treatments with respect to that

16  leg?

17       A.   No.

18       Q.   Do you know if he ever received

19  what's called a permanent partial disability

20  rating?

21       A.   I do not.

22            MR. COOPER:  We didn't get one.

23  BY MR. HADFIELD:

24       Q.   Okay.  I assumed it would have been

25  in here if there was.
```



```
 1                    Has any physician ever told you
 2    that Syr'Eye's growth or functioning has been
 3    impacted permanently as a result of this
 4    accident?
 5         A.    No.
 6         Q.    I do want to go back to the date of
 7    the incident itself.  Did anyone you spoke to
 8    describe to you how the incident happened?
 9         A.    Just my children.
10         Q.    And do you remember what they said
11    specifically as to how it happened?
12         A.    Yes.  So it was my middle child
13    X███████ and another child that was playing on
14    the playground; they were pushing Syr'Eye and
15    E██████ and some other children first.  And then
16    it was Syr'Eye and E███████ turn to push.  And
17    when E█████ pushed, that's when Syr'Eye's -- it
18    came down on Syr'Eye's knee -- his leg, and
19    that's when the incident occurred of him
20    getting hurt.
21         Q.    And was it only your children who
22    told you how this happened?
23         A.    Yeah.
24         Q.    No one else at the scene was able to
25    tell you or describe what happened?
```



Page 37

```
 1        A.   No.
 2        Q.   When you looked at the cruiser, was
 3   there anything about it that appeared unsafe or
 4   dangerous to you?
 5        A.   I initially did not look at the --
 6   like, I didn't.  When we got there, I didn't
 7   view it, so I would say no.
 8        Q.   That's beforehand.  But you did see
 9   the unit, the cruiser, after the accident?
10        A.   Yes.
11        Q.   Was there anything about it, after
12   having looked at it, that you said to yourself
13   I shouldn't have let my children play on it?
14        A.   No.
15        Q.   Nothing about it that looked unsafe?
16        A.   No.
17        Q.   And even to this day is it an
18   apparatus or a piece of equipment that you
19   would prevent your children from playing on it?
20        A.   Yes.
21        Q.   You would not let them play on it
22   today?
23        A.   No.
24        Q.   Did you see whether there was
25   anything -- withdrawn.
```

MAGNA
LEGAL SERVICES

Page 38

```
 1                  On the day of the incident,
 2   after you looked at the cruiser, was there
 3   anything that looked broken on it?
 4        A.   I didn't look at it on the day of
 5   the incident.
 6        Q.   After the incident happened, you
 7   didn't look at it?
 8        A.   After I did, yes.
 9        Q.   Did you see anything that appeared
10   broken on the unit?
11        A.   No.
12        Q.   Have you ever come across a cruiser,
13   this type of piece of equipment, since the date
14   of the accident in any other location?
15        A.   No.
16        Q.   Was there anything about the way the
17   children were playing at the playscape that day
18   that caused you concern?
19        A.   No.
20        Q.   No roughhousing?
21        A.   No.
22        Q.   Nobody was out of control, and I
23   don't mean your children but everyone there?
24        A.   No.
25        Q.   Was it your understanding that there
```



Page 39

```
 1    were adults watching the children play on the

 2    cruiser at the time of the incident?

 3         A.    Yes.

 4         Q.    And certainly nobody voiced to you

 5    any concerns about how the children were

 6    playing in the cruiser before the incident,

 7    correct?

 8         A.    No.

 9              MR. HADFIELD:  I will pass the

10         witness at this point, so I'll check my

11         notes, but I think that's all I have for

12         you for right now.

13              MR. CIOLLO:  I have a few follow-up

14         questions for you.

15    EXAMINATION

16    BY MR. CIOLLO:

17         Q.    I don't think you mentioned this, but

18    did any of your children that were playing

19    there that day have any disabilities of any

20    type?

21         A.    No.

22         Q.    When you mentioned that your two

23    other children explained to you what happened,

24    between those two children was there one of

25    them that gave you more detail than the other
```



Page 40

1   or was able to give you more of what they saw?

2        A.   No.   They all explained equally, yes.

3        Q.   So would it be fair to say that

4   between your two children that saw what

5   happened, they both gave you the same version.

6   Is that fair to say?

7        A.   Yes.

8        Q.   And it wasn't a situation where one

9   of them, as far as you can tell, happened to

10  recall or see more detail than the other?

11       A.   No.

12       Q.   Other than what your children told

13  you about what they saw, when Syr'Eye got hurt,

14  did you ask them for any other specific details

15  about how the accident happened other than what

16  they told you?

17       A.   No.

18       Q.   At the time of this incident, were

19  you or Syr'Eye covered by any health insurance

20  policy?

21       A.   Yes.

22       Q.   What health insurance was that?

23       A.   HUSKY.

24       Q.   And as far as you recall, I'm sure

25  your records will give us more detail, but I'm



1   asking for your memory.  Did you have to pay

2   out of pocket for any of Syr'Eye's medical

3   bills for this incident?

4        A.   No.

5        Q.   And other than perhaps HUSKY, was

6   there any other source of payment or person

7   that would have contributed to Syr'Eye's

8   medical bills being paid?

9        A.   No.

10       Q.   Again, if you know, were there any

11  medical bills that Syr'Eye incurred that were

12  not paid by HUSKY for any reason?

13       A.   No.  I don't believe so.

14       Q.   Was Syr'Eye in school that April at

15  the time of this incident?  Where was he going

16  at that time?

17       A.   ████████████████████  in New Haven.

18       Q.   Would he have been in kindergarten

19  that year?

20       A.   He was in pre-K.

21       Q.   So if this incident happened in the

22  spring of 2014, when would Syr'Eye's pre-K year

23  have ended that year?

24       A.   June.

25       Q.   Can you be any more specific in terms



1    of what in June the last day of school would

2    have been?

3           A.    I don't know.  I believe mid June.

4           Q.    Have you had other children also go

5    to ████████████████?

6           A.    Yes, I did.

7           Q.    And is mid June pretty typical of

8    when the school gets out?

9           A.    Yes.

10          Q.    When Syr'Eye was in this pre-K year

11   at ████████████████, would they typically go

12   outside for recess or even inside to have

13   recess?

14          A.    Yes.

15          Q.    Was there a gymnasium or some sort of

16   inside facility where they can play?

17          A.    There was a gym, yes.

18          Q.    At that time age, forgive me, do they

19   actually have a gym class for them, or is it

20   more of a recess?

21          A.    I believe they had both.

22          Q.    At any time after Syr'Eye's injury on

23   April 11th, 2014, but before school got out in

24   mid June, was he ever able to return to gym

25   class or recess that year?



Page 43

```
 1        A.    He did not return to school at all.

 2        Q.    So would it be fair to say --

 3   strike that.

 4              Did he go for any sort of summer

 5   classes or anything to make up for what he

 6   missed?

 7        A.    No.

 8        Q.    So the next time when he returned to

 9   school was when kindergarten started the next

10   fall?

11        A.    Yes.

12        Q.    He was back at ████?

13        A.    He actually went to another school.

14        Q.    What school did he go to after that?

15        A.    ████████████.  That's in

16   New Haven as well.

17        Q.    And when he had started school that

18   fall at ████████████, were there any

19   restrictions that you know of already placed on

20   his ability to participate in gym or recess, or

21   any physical activity at school?

22        A.    I don't believe he was fully back to

23   100 percent.

24        Q.    Did you have any communication with

25   anyone at ████████████ around that fall or
```



Page 44

1    before school started to let them know about

2    Syr'Eye's limitations or whatever conditions he

3    had?

4         A.   I don't recall.

5         Q.   Do you know if any doctor's notes

6    were submitted to the school so that they knew

7    what he could or couldn't do because of his

8    injury?

9         A.   I don't believe that was submitted.

10        Q.   When you mentioned that he wasn't

11   fully back to 100 percent, so to speak, when he

12   started school that fall, do you remember

13   having any communications with his teachers or

14   the principal's office or anything like that

15   where you guys talked about what had happened

16   to Syr'Eye and that he may not be able to

17   participate?

18        A.   He was able to participate.  He was

19   able to participate, and he was able to run,

20   but it just wasn't at 100 percent.  So I don't

21   remember having a talk with the school because

22   he was able to, but he just wasn't 100 percent,

23   but I honestly don't remember speaking with

24   anyone at the school.

25        Q.   If you had a concern about any



Page 45

1    limitations of Syr'Eye when he started

2    kindergarten, would you have spoken with the

3    school to make sure they were aware that he

4    shouldn't be doing certain things or anything

5    like that?

6         A.   Yes.  If there was something that he

7    was limited to.

8         Q.   Would it be fair to say if you had

9    had any concerns about Syr'Eye's ability to

10   participate in gym or recess and you had

11   concerns that he shouldn't be doing something

12   at school, you would have told that to his

13   teachers or the principal's office, someone

14   there, right?

15        A.   Yes.

16        Q.   You don't recall having any

17   conversation like that?

18        A.   I don't recall.

19        Q.   Again, I recognize you didn't see the

20   incident happen yourself.  You're relying on

21   your children for what they saw.  But when you

22   described earlier, and forgive me, your other

23   son that was pushing the cruiser on the other

24   side of Syr'Eye, what is his name again?

25        A.   E███████.



Page 46

1     Q.  So based on what your children told

2 you, did you have an impression or picture in

3 your mind that E█████ was on one side of the

4 cruiser and Syr'Eye was on the other and they

5 were rocking it back and forth?

6     A.  Yes.

7     Q.  In looking at the picture marked as

8 Exhibit 2, did you ever form an understanding

9 one way or another as to which side E█████ was

10 on and which side Syr'Eye was on?

11     A.  I don't.

12     Q.  And between your children, including

13 Syr'Eye and the gentleman that you think saw

14 it, none of those people have indicated to you

15 which side each of your sons were on?

16     A.  No.

17     Q.  I know you mentioned earlier that you

18 didn't ask your other two sons for any other

19 details of how the incident happened.  Did you

20 ever talk to Syr'Eye to get his take on what

21 happened when he got hurt?

22     A.  Yes.

23     Q.  Did he explain to you anything

24 different that your other two sons didn't tell

25 you?



```
 1        A.    No.
 2        Q.    Did you get the impression that he
 3   was standing up at the time that he was pushing
 4   the rocker back and forth?
 5        A.    Yes.
 6        Q.    Did Syr'Eye or either of your other
 7   sons or the gentleman who was there ever tell
 8   you or indicate to you that Syr'Eye somehow
 9   went underneath the cruiser when he had got
10   hurt?
11        A.    No.
12        Q.    Approximately how tall is Syr'Eye
13   now, if you know?
14        A.    I don't know.
15        Q.    Do you have a recollection of
16   approximately how tall he was when this
17   incident happened?
18        A.    No.
19        Q.    Does he typically have his height and
20   weight measured when he goes for his checkups?
21        A.    Yes.
22        Q.    Who is his primary care physician
23   now?
24        A.    ███████  Pediatrics, and that's in
25   Hamden.
```



```
 1        Q.    Was he also going to ▮▮▮▮▮
 2   Pediatrics in 2014?
 3        A.    Yes.
 4        Q.    Would you have expected, based on
 5   your interactions with them, that they would
 6   have information about his periodic checkups,
 7   height and weight, things like that?
 8        A.    Yes.
 9        Q.    Are you typically with him when he's
10   getting examined?
11        A.    Yes.
12        Q.    So you've been there and see him
13   getting measured, height and weight?
14        A.    Yes.
15        Q.    Have you ever been back to Josh's
16   Jungle since this incident happened?
17        A.    No.
18        Q.    Has Syr'Eye been back there?
19        A.    No.
20        Q.    As far as you know, have any of the
21   other children been back there?
22        A.    No.
23        Q.    As far as you are aware, neither you
24   nor your children have been back there,
25   correct?
```



1  A. Correct, yes.

2  Q. When you mentioned earlier that you

3 wouldn't let your children use the cruiser

4 today, was that simply because this incident

5 happened or some other detail, information that

6 would cause you to not let them use it?

7  A. Because this incident happened.

8  Q. After this incident happened, did you

9 yourself pursue any type of investigation into

10 trying to figure out if there were any defects

11 or problems with the cruiser?

12  A. No.

13  Q. And, again, I'm not asking about

14 anything that you have heard from your

15 attorney; I don't want you to tell me anything

16 he told you, but as far as, has anyone in your

17 family or friend of yours done any

18 information gathering to try to find out more

19 information about the cruiser?

20  A. No.

21  Q. Did you form any understanding from

22 your children or from Syr'Eye or from the

23 gentleman that, when the cruiser hit Syr'Eye,

24 that he fell down or fell onto his back or on

25 his bottom in some way, or did he keep standing



Page 50

1   up, if you know, when he got hit?

2          A.   Well, it went -- when it came down on

3   his leg and his knee, it was wedged under

4   there.  So to my understanding, he would have

5   had to have kind of fallen to the ground.  He

6   wouldn't have been standing up because of the

7   way it fell onto his leg.

8          Q.   Did you have the impression that just

9   before he was injured that he was facing the

10  cruiser and pushing it?

11         A.   To my understanding, he was facing

12  it, yes.

13         Q.   Do you have any information about any

14  other children or people that have ever been

15  injured using a cruiser at Josh's Jungle?

16         A.   No.

17              MR. CIOLLO:  Thank you, ma'am.  I

18         have no other questions for you.

19              MR. COOPER:  I don't have any.

20              MR. HADFIELD:  Just a couple.

21  BY MR. HADFIELD:

22         Q.   Have any of your other children ever

23  been injured on a playground before?

24         A.   No.

25         Q.   No scratches, broken bones, anything



Page 51

```
 1   like that?

 2        A.    No.

 3        Q.    Bloody noses?

 4        A.    No.

 5              MR. HADFIELD:   Those are all the

 6        questions I have.

 7

 8              (Whereupon, the deposition

 9        concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                          TABLE OF CONTENTS
```



```
 1
 2                                        Page
 3   EXAMINATION/WITNESS
 4   MELISSA SANTOS-JEFFERIES
 5       By Mr. Hadfield:              4, 50
 6       By Mr. Ciollo:               39
 7
 8
 9       Defendant's Exhibits
10
11       Exhibit 1   Deposition notice   5
12       Exhibit 2   Photos              17
13
14
15
16       (Exhibits retained by the court reporter.)
17
18
19
20
21
22
23
24
25
```



Page 53

1                    STATE OF CONNECTICUT

2

3        I, Nadine M. Castonguay, a Notary Public

4   for the State of Connecticut, do hereby certify

5   that the deposition was taken before me.

6        I further certify that the deponent was

7   first sworn by me to tell the truth, the whole

8   truth, and nothing but the truth, and was

9   examined by counsel, and that the testimony was

10   stenographically reported by me and

11   subsequently transcribed as hereinbefore

12   appears.

13        I further certify that I am not related to

14   the parties hereto or their counsel, and that I

15   am not in any way interested in the event of

16   said cause.

17        Dated March 21, 2018.

18                    Nadine M. Castonguay, RPR

19                    Notary Public

20

21                    ----------------------

22                    My commission expires: 12/31/18

23

24

25

